## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | |
|---|---|
| CURTIS K. WILLIAMS II, PhD<br>c/o The Pattakos Law Firm LLC<br>101 Ghent Road<br>Fairlawn, Ohio 44333<br><br>       Plaintiff,<br>  vs.<br><br>SUMMIT COUNTY<br>175 South Main Street, #8<br>Akron, Ohio 44308<br><br>THE CITY OF AKRON<br>166 South High Street<br>Akron, Ohio 44308<br><br>HON. ELINOR MARSH STORMER<br>Summit County Probate Court<br>209 South High Street<br>Akron, Ohio 44308<br><br>SERGEANT JAMES RIMEDIO<br>Summit County Sheriff's Office<br>53 University Avenue<br>Akron, Ohio 44308<br><br>DEPUTY JASON BEAM<br>Summit County Sheriff's Office<br>53 University Avenue<br>Akron, Ohio 44308<br><br>DEPUTY THOMAS FICKES<br>Summit County Sheriff's Office<br>53 University Avenue<br>Akron, Ohio 44308<br><br>TAMMY WAGNER<br>Civil clerk<br>Summit County Sheriff's Office<br>53 University Avenue<br>Akron, Ohio 44308<br><br>      Defendants. | Case No.  _____<br><br>Judge _____<br><br>**Complaint with Jury Demand** |

## I. Introduction

1.      This case seeks to remedy damage caused by Defendants' unfortunate and unconstitutional escalation of events arising from an interaction between a licensed court-appointed social worker, Plaintiff Curtis Williams, and a judge, Defendant Elinore Marsh Stormer, at an entrance of the Summit County courthouse in Akron on September 15, 2020.

2.      In short, a dispute between Judge Stormer and Dr. Williams about the latter's authority to access the building through this entrance, that could and should have been easily resolved by a short conversation with courthouse security officers who were only steps away, instead resulted in the judge first assaulting Williams, then falsely accusing him of assaulting her, misrepresenting him as an urgent and violent threat to building security, and having him beaten, tackled, tased, handcuffed and arrested by courthouse police. Then, to justify this needless and deplorable use of force against this court-appointed social worker—a black man who wears dreadlocks and stands 6 feet and 3 inches tall—the judge and police then conspired to charge Williams with crimes he didn't commit, including assault against the judge. And yet worse, when the police realized that the five surrounding surveillance cameras had documented the egregiously unconstitutional nature of the beating they gave to Williams and the utter meritlessness of the criminal proceedings they instituted against him, they simply destroyed the footage from four of these cameras to conceal their wrongful acts.

3.      While the wrongful charges against Dr. Williams were eventually dismissed by the presiding judge on speedy-trial grounds—as the prosecution alternately struggled to force Williams into a plea agreement, coerce him into signing an apology and agreement not to sue, or offer any remotely legitimate basis for the proceedings—Williams' employers relieved him of his duties with the HOPE Court and he lived for more than a year subject to the threat of a career-destroying conviction for assaulting a judge.

4.      As alleged herein, Defendants' actions, and the circumstances creating the incentives for these actions, offer an extraordinarily compelling demonstration of the importance of the protections offered by the Constitution and 42 U.S.C. § 1983 against abuses by those entrusted with state power.

5.      In particular, this case illustrates the problematic manifestation of an all-too-common fact pattern that has resulted from the Supreme Court's landmark decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), where it held that putative 1983 plaintiffs are barred from pursuing a remedy for civil-rights abuses, no matter how egregious, if that remedy would imply the invalidity of any criminal conviction, no matter how minor, related thereto. Thus, in any case where egregious police misconduct is at issue, as here, *Heck* incentivizes the responsible officers to trump up baseless criminal charges against the victim—such as for assault, resisting arrest, or disorderly conduct—to insulate themselves from liability, knowing that the average citizen will be less likely to stand a criminal trial to retain the right to pursue their civil claims. Here, the want to avoid accountability for civil rights violations was so great that it incentivized the officers to go so far as to deliberately destroy obviously extant exculpatory evidence.

6.      State actors, like Defendants here, who initiate baseless criminal proceedings with the intent to bar the subject of those proceedings from suing to remedy a civil right abuse under *Heck* violate that citizens fundamental First Amendment right to access the Courts. Defendants Summit County and the City of Akron are herein alleged to have adopted and employed a custom, policy, and practice of depriving such citizens of their First Amendment rights in precisely this manner.

7.      This Complaint therefore asserts claims under 42 U.S.C. § 1983 for Defendants' violations of Dr. Williams' First Amendment right to petition federal and state courts for civil relief, and his rights under the Fourth, Fifth, and Fourteenth Amendments to be free from excessive force, malicious prosecution, and fabrication and falsification of evidence against him by state actors.

8.      Dr. Williams also herein asserts claims under Ohio law for malicious prosecution and spoliation of evidence.

## II.  Jurisdiction and Venue

9.      This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for the claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the claims raised under Ohio law.

10.     This Court has jurisdiction over Defendants because they are residents or political subdivisions of the State of Ohio.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the claims in this litigation are based and the damages resulting therefrom occurred in Summit County, Ohio.

## III.  Parties

12.     Plaintiff Curtis Williams is a U.S. Citizen and a resident of the City of Akron in Summit County, Ohio.

13.     Defendant Summit County is a political subdivision of the State of Ohio, subject to suit under 42 U.S.C. § 1983 and the U.S. Constitution for adopting, supporting, and permitting unconstitutional customs, policies, and practices as alleged herein. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

14.     Defendant City of Akron is also a political subdivision of the State of Ohio, the largest city and county seat of Summit County, and is also subject to suit under 42 U.S.C. § 1983 and the U.S. Constitution for adopting, supporting, and permitting the unconstitutional customs, policies, and practices alleged herein. *Id.*

15.     Defendant Elinor Marsh Stormer is, and at all relevant times was, the elected judge of the Summit County Probate Court. On information and belief, Judge Stormer is also an Akron resident.

4

16. Defendants James Rimedio, Jason Beam, Tammy Wagner, and Thomas Fickes are, or at all relevant times were residents of Ohio and employees of the Summit County Sheriff's Office assigned to duty at the Summit County courthouse in Akron.

## IV.  Facts

### A. The events of September 15, 2021 and the baseless criminal charges against Dr. Williams

17. Plaintiff Curtis Williams is trained psychologist and licensed social worker, who, at all relevant times, was working at the Summit County courthouse pursuant to an appointment by Common Pleas Judge Alison Breaux to assist in the administration of the "HOPE Court." According to a press release issued by the court, the HOPE Court is a specialized docket intended to "reduc[e] contact with the criminal justice system for [defendants] with mental illness" by "addressing underlying [health] problems that can lead to criminal behavior and lowering the rate of recidivism."[1]

18. As a member of the HOPE court's advisory committee, Dr. Williams, through his employer Minority Behavior Health of Akron, provides personal advice for citizens charged in the court, and also advises the court on its policies and procedures. In addition to his work with the HOPE court, Dr. Williams played a similar role with Common Pleas Judge Amy Corrigall Jones's Valor Court, which pursues similar objectives regarding U.S. veterans charged with crimes in Summit County, and, as of September 2020, was in courthouse approximately three to four days a week.

19. On the afternoon of September 15, 2021, a Tuesday, Dr. William was co-facilitating a group session for a group of the HOPE Court's parolees that started at 2:00 PM, to check in on their ongoing health concerns and assess the impact of their health issues on their participation in the

---

[1] https://www.summitcpcourt.net/judge-alison-breauxs-hope-mental-health-court-awarded-the-edward-byrne-memorial-justice-assistance-grant/

criminal justice system. Because it was a warm and sunny day, Dr. Williams and his team decided to hold the session in the outdoor courtyard to better allow for safe distancing to prevent the spread of COVID-19. At approximately 2:30 pm Dr. Williams realized that a prescription drug he was taking to address a health issue was creating a physical need for him to urinate, but he was reluctant to leave the session due to the particular and sensitive nature of his work with the HOPE Court defendants and the need to apply consistent and particularized attention to that work in order for it to be effective. As the meeting was adjourning at approximately 2:50 pm, Williams recognized that his need to access the courthouse restroom was urgent. Williams also realized that he would need to take a much longer walk around the building to enter through the main entrance and was fearful he would not make it to the restroom in time if he did so, so he decided to enter through the courtyard doorway that was in his immediate vicinity.

20.      During that afternoon's session, he had observed numerous people going in and out of this glass doorway, which was within approximately 30 feet and plain sight of the building's main security checkpoint and entryway. Thus, Williams figured he could easily obtain permission from one of the building's security guards to re-enter the building through this courtyard entrance. Notably, this door did not have any signage on it stating that it was a prohibited entrance, and indeed had a sign on it stating, "Mask Required for Admission to Courthouse Effective 05/05/2020," suggesting that anyone may enter through that door as long as they are wearing a mask, as Williams was.





21.     As Dr. Williams approached this courtyard door, however, he was confronted by Summit County probate court Judge Elinor Marsh Stormer, who was personally unknown to Williams and dressed in plain clothes. As the judge opened the door, she took issue with Dr. Williams entering the building through what she deemed to be—but was not marked as—an unauthorized entrance, that was approximately thirty feet away from and in plain view of the building's main entrance and security desk. Williams explained to the judge that he worked in the building and urgently needed to use the restroom, as he continued to pull the door open to allow the her to exit the building, and so he could enter. Then, to Williams' shock, the judge—as she later admitted in a written statement she provided to the police—initiated physical contact with him by shoving him in his chest away from the doorway.



> stepped out he moved in front of me to come in.
> I put my hands up + said you can't come in this way.
> He said he could, I asked if he was a police officer.
> He just said he could come in this way. As he continued
> forward I pressed my hands to his chest + repeated
> "Sir you can't come in this way." He said "You're pushing
> me" + I said "Yes, you can't come in this door."

22. Despite his shock at this as-yet unidentified and unknown woman's conduct, Dr. Williams did not raise his hands or place them on her. Rather, he peacefully walked past her toward the security desk—which, again, was a few steps away in plain sight—to resolve the simple matter of his authority to re-enter to access a public restroom in this public building, where he was working to serve the public, during hours in which this building was open to the public.

23. This matter should and would have been easily resolved by a brief conversation between Dr. Williams, the judge, and the security officers standing nearby. Instead, however, the Judge falsely accused Williams of assaulting her and misrepresented him as a violent threat, screaming at the top of her lungs to knowingly and maliciously set the courthouse police on him, and then, incredibly, walking away from the scene and out of the building while four officers—Defendant James Beam, Defendant Thomas Fickes, John Toth, and James Wilson, all Summit County Deputy Sheriffs— proceeded to needlessly and excessively beat, tackle, tase, pin, handcuff, and humiliate Williams on the lobby floor, as passersby, including Judge Breaux herself, looked on in bewilderment.

> He continued forward + I could not stop him.
> I stepped back into the courthouse + called for the
> deputies saying "I'm trying to leave + this man has
> forced his way in." The deputies responded + then I
> left through the door

ADDRESS OF WITNESS 209 S High St Akron   PHONE

SIGNATURE OF WITNESS   X Clarine Marion Smyne

OFFICER'S SIGNATURE   X J. Beam #28





24.     Deputies Beam and Fickes were the first two to rush at Williams in response to the judge's false alarm. As they charged toward him they barked conflicting orders that he both remain against the wall and get on the floor as they struck him and wrestled with him. Naturally confused and terrified by this stunning escalation of violence, Dr. Williams tried to explain his situation to the police officers and demonstrate the lack of need for their use of force, while also looking for a familiar face. *Id.* As four additional officers approached the scene, Williams heard one of them explain that they recognized him as someone who worked at the courthouse. This statement was unfortunately disregarded, as Deputy Fickes then deployed a taser on Williams as he was tackled and pinned to the floor, handcuffed, and taken to a courthouse holding cell where he could finally use a toilet. *Id.*

25.     From here, the deputies shortly realized that they had a problem. Now locked up in the holding cell, Dr. Williams had finally been able to get through to the officers that he had done nothing wrong, and was simply a court-appointed psychologist on duty at the courthouse that day who had peacefully approached the security desk through the open courtyard door to confirm his authority to re-enter the building to satisfy his urgent medical need to use a restroom. Thus, Williams, from the cell, overheard the officers openly wondering why it was necessary for them to have brutalized him in the first place, and complaining that Judge Stormer had not only, bizarrely, immediately fled the scene after falsely alarming them, but was not answering their phone calls.

26.     After about an hour and half with Dr. Williams still locked up, the officers were finally able to get a hold of Judge Stormer, at which point Summit County Sheriff's Sergeant James V. Rimedio, who was charged with investigating the incident, briefly interviewed Williams. During this interview, Rimedio mentioned to Williams that the incident was captured on camera. To this, Williams responded, "good," because he knew the cameras would confirm that he was a needless victim of police brutality. Yet Williams was shortly, again, shocked to receive a document from the officers

11

informing him that *he* was being charged in the Akron Municipal Court with assaulting Judge

Stormer in violation of R.C. 2903.13, as well as the crimes of trespass under R.C. 2911.21, and

disorderly conduct under R.C. 2917.11.

27.     Dr. Williams was then released from police custody, subject to the pretrial-release conditions

imposed by Akron Municipal Court Rule 33 which required a mandatory $2,000.00 bond on the

assault charge. He was then arraigned on the charges of assault, trespass, and disorderly conduct on

September 24, 2020 and pleaded not guilty.

**B.      Records of the so-called "investigation" against Williams reveal numerous false and
fabricated statements, the destruction of conclusively exculpatory video evidence,
and the baseless and malicious nature of the prosecution against him.**

28.     On October 1, 2020, Williams timely served upon the prosecutor in this case, a an attorney

from the City of Akron's Law Department, a request for all discovery to which he is entitled under

Ohio Crim.R. 16. In response, the prosecutor produced various witness statements and police

reports discussed further below, as well as surveillance video from only one of at least five relevant

cameras in its custody, the other four of which all would have provided a complete picture of the

allegedly criminal conduct at issue.

29.     In her written statement executed the day after the incident, Judge Stormer confirms that

when she first opened the door to confront Dr. Williams, he "stepped back and waited" for her to

walk through. Then, as the judge describes, Williams "moved in front of me to come in." At this

point, the judge admitted that, "[a]s [Williams] continued forward **I pressed my hands to his chest**

[...] **he said, 'you're pushing me' and I said 'yes**, you can't come in this door.'" *Id.* (emphasis

added). Then, as the judge's statement concludes,

> [Williams] continued forward and I could not stop him. I stepped
> back into the building and called for the deputies saying, 'I'm trying
> to leave and this man has forced his way in.' The deputies responded
> and then I left through the door.

30.     While the judge's written statement misleadingly omits mention of the alarm she caused to the officers by screaming at the top of her lungs, falsely accusing Williams of assaulting her, and misrepresenting him as an urgent and violent threat to courthouse security, it is notable that the judge—who was undoubtedly aware that the surrounding surveillance cameras would provide a complete visual picture of her physical interaction with Williams—does not otherwise say or even suggest that Williams "shoved," "pushed," or "grabbed" her. Other witnesses who provided statements pursuant to the investigation were not so savvy, as discussed below.

31.     The judge's written statement is, in fact, consistent with the incomplete surveillance footage produced by the state, incorporated in this Complaint pursuant to the below links where they may be securely accessed.[2] While the bulk of the interaction between Dr. Williams and the judge only appears as shadows in this video, it is clear enough from these shadows that the judge, consistent with her written statement, did in fact initiate physical contact with Williams, who did not "shove," "push," or "grab" her, but rather kept his hands at his sides as he walked past her through the door directly toward the security desk, which was only approximately 30 feet away in plain view from where the interaction took place.

---

[2] The referenced surveillance video can be accessed at the following links:

https://thepattakoslawfirmlcc.box.com/s/b0kuup4ipgj2sf7xkqfu5wffkri926ig

https://thepattakoslawfirmlcc.box.com/s/j1ck0zes0zyi7pi7dob9ebv6gj9hk128





32.     This video also clearly shows that the judge was dressed in plain clothes that did not signify any lawful authority over this entryway, and that as Williams walked past her, she called for the police, who immediately rushed to tackle Williams as the she immediately left the scene.

33.     Of course, it beggars belief that the judge would have fled the scene so quickly and breezily had Williams engaged in conduct that would in any way approximate an unlawful assault on her or otherwise present a legitimate and urgent threat to courthouse security.





34.     Notably, the incomplete surveillance footage produced not only fails to provide a direct

picture of the interaction between Williams and the judge, it also conveniently excludes the bulk of

what occurred between Williams and the two police officers who first rushed him, struck him, and

grabbed him. *Id.*



35.     This video does however confirm that Williams did not take any actions inconsistent with

his right under Ohio law to reasonably protect himself against the officers' unwarranted use of force,

and indeed made an effort to keep his hands up to make clear that he did not pose any threat. *See*

*State v. Elko*, 2020-Ohio-4466, 158 N.E.3d 929, ¶ 40–43 (8th Dist.) ("[R]esisting arrest and resisting

an officer's use of excessive force in making an arrest are two different things."), citing *Columbus v.*

*Fraley*, 41 Ohio St.2d 173, 180, 324 N.E.2d 735 (1975) ("*In the absence of excessive or unnecessary force by*

*an arresting officer*, a private citizen may not use force to resist arrest by ... an authorized police officer

engaged in the performance of his duties, whether or not the arrest is illegal under the

circumstances."); *State v. Critchfield*, 9th Dist. Summit C.A. No. 12124, 1985 Ohio App. LEXIS 9032,

at *5-6 (Oct. 16, 1985) ("[T]he officer may use no more than reasonable force[.]"), citing *Fraley*; *State*

*v. Logsdon*, 3d Dist. Seneca Case No. 13-89-10, 1990 Ohio App. LEXIS 5749, at *4-5 (Dec. 4, 1990)

("The use of excessive force by an officer in effecting an arrest may amount to an assault against the arrestee, against which the arrestee could be justified under the right of self-defense to respond with reasonable force."), citing *Fraley*; *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (analyzing whether an officer's use of force was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"); *Thacker v. Lawrence Cnty.*, 182 F.Appx. 464, 472 (6th Cir.2006) ("[D]isorderly conduct is not a violent or serious crime, and this fact weighs in favor of using less force in arresting [a suspect].").



36.     Despite the judge's written admissions, the video evidence described above, and the other surveillance cameras that captured a complete picture of Dr. Williams' interaction with the judge, various police reports and statements given by the Defendant representatives of the Sheriff's office falsely state that Williams "grabbed," "shoved," and "pushed" the judge, and do so without suggesting, let alone acknowledging, that it was in fact the judge who did those things to Williams.

37.     First, on the date of the incident Deputy Jason Beam generated a "field arrest form" in which he falsely states that "Mr. Williams did push Judge Stormer during his attempt to enter the Summit County Courthouse through a secured door." The next day, Beam submitted a separate "uniform incident report" where he similarly states that "Williams pushed and grabbed Mrs. Stormer several times before gaining entry."

38.     According to Defendant Tammy Wagner—a clerk for the Sheriff's office whose courthouse office faces the entryway at issue and who also provided a written statement that was used by the prosecution—Deputy Beam did not even witness the interaction between Williams and the judge first-hand. According to Wagner, she witnessed Williams "grabbed both of [the judge's] arms and shoved her through the door to push past her." "[A]t this moment," Wagner stated, "Deputy Beam was standing with his back to the window," and she "said to him as [she] poined out the window, 'Hey there is a situation happening she needs help!'" "That," said Wagner, "is when Deputy Beam ran from the office" as Wagner "continued to watch" the so-called "struggle happen." Then, Wagner continued to embellish, "Judge Stormer broke free from [William]s once he was in the building and she rushed past him and out the door."

39.     As with Beam's fictionalized account, Wagner does not mention or suggest that the judge pushed Williams or otherwise initiated physical contact with him, despite purporting to have witnessed the entire interaction, and purporting to have recounted it in detail.

40.     Beam and Wagner are the only two witnesses who claim to have witnessed the interaction between Williams and the judge first-hand, but Defendant Sergeant James Rimedio, who was charged with leading the investigation of this incident, verified their false statements in his summary report of his investigation. Specifically, Rimedio's report states that he "review[ed] all the written reports, witness statements and video footage of the incident," and concludes both that "Williams grabbed [the judge's arms and pushed her through the doorway," and that the responding officers' "application of force" against Williams was "objectively reasonable" and "predicated entirely by the actions of [Williams]."

41.     Notably, Rimedio specifically notes in his report that the surveillance video "shows a struggle between the shadows" between Williams and the judge, but he does not reference the existence of the additional cameras that would have depicted precisely what happened in these shadows, let alone explain why footage from these cameras would not have been reviewed.

42.     In fact, none of the sworn statements or other documents produced by the state in discovery referenced or purported to explain the missing surveillance footage, despite Williams' repeated requests for it, including on the record at a March 9, 2021 pretrial, and by a March 10, 2021 email attaching photos of at least four surveillance cameras conspicuously placed around the scene of the alleged crime that would have captured a full view of what actually happened.

43.     This includes an exterior camera posted at the immediate left of the entryway that was plainly intended to record ingress and egress to the building (A) as well as an interior camera pointed directly through the entryway (B) each of which would have captured the entire interaction between Williams and the judge, including the so-called "struggle between the shadows" described in Rimedio's report.







44.     An additional interior camera posted to the immediate right of the entryway (C) would have

also provided a more complete picture of that interaction, as well as, along with the aforementioned

camera posted directly through the entryway (B), the full extent of the interaction between Williams

and the police who first rushed to needlessly deploy force on him. The footage from these cameras

would have conclusively put lie to the officer's false and fabricated statements intended to justify

their use of excessive force against Williams, including Beam's statement that Williams "refused" to "get against the wall" and "began to resist."

45.     And a camera posted on the exterior wall of the Akron municipal building, directly across from the entryway (D) would have also provided a direct view of the interaction between Williams and the judge.





46.     The video that the prosecution did produce was from a single camera to the immediate left of the interior entryway (E), which happened to be the camera that would provide the most incomplete picture of the incident among all five of these cameras, and which, most conveniently for Defendants, failed to capture most of what happened between Williams and the judge.

47.     On March 16, 2021, the assistant prosecutor forwarded Williams' attorney an email from the Akron Police Department in response to the March 9 and March 10 requests, stating that the surveillance cameras across the courtyard owned by the city, "may have recorded the incident," but are automatically "recorded over" after three weeks, and were not preserved.

48.     On that same day, the assistant prosecutor forwarded Williams' attorney an email from the Summit County Sheriff's office confirming that "there is no ability to pull an archive video" from the outdoor surveillance camera positioned over the entryway at issue, and that "the current video feed from that camera has a blank screen encrypted with 'no video.'"

49.     On March 22, 2021 the assistant prosecutor emailed Williams' attorney to state that she "sent subpoenas out last week to the Sheriff's office for additional video," including from the two additional interior cameras that would have captured the incident.

50.     And on March 30, 2021, the assistant prosecutor emailed the undersigned to state that she "check[ed] with" Sergeant Rimedio and "he informed [her] that the video we have is the only video of the incident."

51.     To date, and despite repeated requests from Williams' attorneys, the prosecutor has provided no other explanation as to why the surveillance video from the other available cameras has not been produced. Nor would the City of Akron's Law Department or the judge and officers named as Defendants herein agree to dismiss the meritless criminal charges against Williams as the unconstitutional nature of the disappeared surveillance video became apparent.

52.     In fact, as Williams' attorneys became more dogged in pursuing the missing surveillance video, Defendants and the City prosecutor only became more resolute in their intent to convict him for a crime.

53.     To wit, on February 19, 2021, the prosecutor sent Williams's originally retained attorney an email stating that the City would dismiss the charges against Williams on two conditions: (1) if he would "sign a waiver stating that in exchange for the dismissal he agrees not to sue any party involved," and (2) if he would "write and sign an apology letter to Judge Stormer acknowledging that he handled the situation poorly and that he won't make the mistake again."

54.     It was on March 9, 2021 that Williams terminated his original attorney, to have a new attorney, the undersigned, appear on his behalf at the scheduled pretrial conference on that date. Before the undersigned—who had provided notice of his appearance to the prosecutor earlier that day—could even get a word in at this pretrial, the City prosecutor, in chambers, informed the undersigned and presiding visiting Judge James Kimbler that Judge Stormer was angry that Williams had not yet agreed to sign a waiver and apology, and "wanted to move forward" with the assault charge.

55.     On April 6, 2021, after it became apparent from the above-cited communications with the prosecutor that the prosecutor would not produce any additional surveillance video, and had no legitimate explanation for this failure, Williams filed a motion to dismiss the charges against him based on the state's apparent breach of its duty to retain and disclose exculpatory evidence to criminal defendants pursuant to the due process clauses of the United States Constitution as explained and interpreted by the U.S. Supreme Court in *Brady v. Maryland*, 373 U.S. 83, *California v. Trombetta,* 467 U.S. 479, and *Arizona v. Youngblood*, 488 U.S. 51. *See also State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991), citing *Brady* and *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988).

56.     On April 15, 2021, Judge Kimbler set Williams' Brady motion for an evidentiary hearing to take place on May 19, 2021.

57.     On April 21, 2021, Williams filed a motion to dismiss the charges against him based on the state's violation of his Sixth Amendment right to a speedy trial.

58.     In preparing for the May 19 hearing on the *Brady* motion, Williams' attorneys interviewed employees of the Summit County courthouse's IT department, including Ken Teleis, who confirmed that the Sheriff's office maintained control of the surveillance cameras, that if "the cameras [were] down that would have been reported to the vendor very quickly," and that he didn't have any recollection that there were any problems with these cameras.

59.     At the start of the May 19 hearing, Judge Kimbler granted Williams' speedy-trial motion, dismissing the charges against him without hearing any evidence on the *Brady* motion.

60.     On June 21, 2021 the City of Akron's Law Department, on behalf of the state, filed a notice of appeal of Judge Kimbler's decision to dismiss the charges against Williams. On December 16, 2021 the state filed a motion to dismiss its appeal. And on January 21, 2022, the state's motion to dismiss was granted, thereby terminating the criminal proceedings in Williams' favor.

61. Since the final dismissal of the criminal charges against him in January, Williams has been engaged in ongoing conversations with Summit County Law Department officials and has made every reasonable effort to amicably resolve the claims asserted herein. Just three days ago, on September 12, 2022, an Assistant Law Director notified Williams' counsel that the County would not make any offer in response to Williams' opening settlement demand.

## V. Causes of Action

### Count 1
### Unreasonable Seizure
### Fourth Amendment and 42 U.S.C. § 1983
### (against Defendants Stormer, Beam, and Fickes)

62. Plaintiff incorporates the previous allegations by reference.

63. This Count 1 is alleged against Defendants Stormer, Beam, and Fickes individually, in their personal capacities.

64. With purpose and intent, acting under color of law, Defendants Stormer, Beam, and Fickes caused the unlawful arrested, detainment, and seizure of Dr. William's person. Reasonable officers in the respective positions of these Defendants would not have initiated this seizure. These Defendants seized Williams without probable cause or reasonable need to do so. The unlawful seizure was objectively unreasonable under the Fourth Amendment.

65. By her actions asserted herein that initiated the unlawful seizure, Judge Stormer was acting under color of law in her administrative capacity as the Summit County Probate Judge. This capacity includes Judge Stormer's duty and authority to "employ and supervise all clerks, deputies, magistrates, and other employees of the probate division" pursuant to O.R.C. § 2101.01(A), including the courthouse deputies whose actions are discussed herein, as well has her responsibilities under the Ohio Rules of Superintendence, including Rule 4.01 which charges her with "responsibility" and "control" over the "administration" of the Court, Rule 9, which charges the court to "develop and implement a court security plan," and Summit County Probate Court Local

Rule 9.1, pursuant to which Judge Stormer's court "has adopted and implemented a local Security Policy and Procedures Plan." Had Judge Stormer not been "clothed with the authority of" these and other state law provisions, including the basic matter of her status as a presiding judge in the courthouse where these events took place, Williams would not have been unlawfully arrested, detained, and seized as alleged herein. Rather, a brief and peaceful conversation would have ensued that would have precluded this entire series of events.

66.     Defendants Beam and Fickes were also acting under color of law in wrongly arresting, detaining, and seizing Williams, as they were acting in their capacities as Summit County Sheriff's Deputies, on duty, and responsible, in part, for maintaining safety and security at the courthouse.

67.     By their actions alleged herein, Defendants Stormer, Beam, and Fickes, taken under color of law, they deprived Williams of his right to freedom from illegal seizure of his person that is secured to him by the Fourth Amendment and was clearly established as of September 15, 2020. All of these actions caused damage to Williams.

68.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Dr. Williams' rights, Williams has suffered and will continue to suffer economic and non-economic damages for which Defendants Stormer, Beam, and Fickes are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Williams is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

## Count 2
### Excessive force
### Fourth Amendment and 42 U.S.C. § 1983
### (against Defendants Stormer, Beam, and Fickes)

69.     Plaintiff incorporates the previous allegations by reference.

70.     This Count 2 is alleged against Defendants Stormer, Beam, and Fickes individually, in their personal capacities.

71.      With purpose and intent, acting under color of law, Defendants Stormer, Beam, and Fickes used or caused the use of excessive force against Dr. Williams to terrorize him. Even if Defendants' arrest of Dr. Williams was reasonable and lawful (it was not), a reasonable officer would not have used the kind of force that Defendants used to detain him.

72.      Officers Beam and Fickes used a grossly unnecessary amount of force to detain Williams, which is shocking to a person of ordinary conscience and unjustifiable under the circumstances, including the peaceful demeanor displayed by Williams prior to the officers' deployment of force against him, his status as a court appointed social worker who was working that day in the courthouse during its normal hours of operation, the complete lack of unlawful, violent, or threatening conduct on his part, and his basic and reasonable explanation for his presence in the building at the time the officers initiated force against him. The amount of force used to accomplish the detention was without probable cause or reasonable need, and was clearly excessive and objectively unreasonable.

73.      By her actions asserted herein that initiated the unlawful seizure, Judge Stormer was acting under color of law in her administrative capacity as the Summit County Probate Judge as alleged in Count 1 above, and intentionally caused Officers Beam and Fickes to employ excessive force against Dr. Williams with her misrepresentations and actions against him as alleged herein, including her actions in cavalierly vacating the premises as the officers began to unnecessarily tackle and beat Williams. Had Judge Stormer not been "clothed with the authority of" the above cited and other state law provisions, including the basic matter of her status as a presiding judge in the courthouse where these events took place, Williams would not have been subject to excessive force as alleged herein. Rather, a brief and peaceful conversation would have ensued that would have precluded this entire series of events.

74.     Defendants Beam and Fickes were also acting under color of law in employing excessive force against Dr. Williams, as they were acting in their capacities as Summit County Sheriff's Deputies, on duty, and responsible, in part, for maintaining safety and security at the courthouse.

75.     Reasonable officers in the respective positions of these Defendants would not have initiated any such use of force against Dr. Williams.

76.     By their actions alleged herein, all taken under color of law, Defendants Stormer, Beam, and Fickes deprived Williams of his right to freedom from excessive force that is secured to him by the Fourth Amendment and was clearly established as of September 15, 2020. All of these actions caused damage to Williams.

77.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Dr. Williams' rights, Williams has suffered and will continue to suffer economic and non-economic damages for which Defendants Stormer, Beam, and Fickes are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Williams is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 3**
**Violation of Right to Access Courts/Retaliatory Prosecution**
**First Amendment and 42 U.S.C. § 1983**
**(against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner)**

78.     Plaintiff incorporates the previous allegations by reference.

79.     This Count 3 is alleged against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner individually, in their personal capacities.

80.     "The filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment." *Eckerman v. Tennessee Dept. of Safety*, 636 F.3d 202, 208 (6th Cir.2010). The First Amendment also clearly protects a citizen's "entitle[ment] to speak as they please on matters vital to them." *Wood v. Georgia*, 370 U.S. 375, 389, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).

81.    Defendants Stormer, Rimedio, Beam, Fickes, and Wagner all knew, as of September 15, 2020, that Dr. Williams had been subject to a needless and deplorable use of force as a result of the unconstitutional actions of Defendants Stormer, Beam, and Fickes as alleged above. They also knew that Dr. Williams had a right to file a lawsuit under 42 U.S.C. § 1983 to redress the harm caused by this egregious and patently unconstitutional conduct, and they knew, based on Williams' own direct statements to them, that he intended to vindicate those rights. Additionally, these Defendants knew, pursuant to a custom, policy, and practice adopted, permitted, and supported by Summit County, that Williams would be substantially hampered, if not outright prevented, from filing such a lawsuit if he were subject to a baseless criminal prosecution that would put pressure on him to plead to a minor misdemeanor, or otherwise sign an agreement not to sue in connection with these events. Under the long-established doctrine announced by the U.S. *Heck v. Humphrey*, 512 U.S. 477 (1994), of which these state officers were well aware, any such plea, even to a minor misdemeanor, would effectively bar Williams from filing a lawsuit to redress his grievances over these unconstitutional events.

82.    Thus, in an effort to insulate the County from liability, Judge Stormer, and Deputies Beam and Fickes from civil liability, these Defendants conspired to engineer the baseless and malicious prosecution against Dr. Williams for the purpose of negating his right and retaliating against his expressed intent to file suit on his constitutional claims. In so doing, Defendants conspired to concoct a fabricated narrative, laden with false statements, and dependent on Sergeant Rimedio's deliberate destruction of the footage from the four surveillance cameras that conclusively demonstrated Williams' innocence of these malicious charges, the lack of probable cause behind them, and Defendants' own liability to Williams for having violated his civil rights.

83.    Defendants' institution of a malicious and baseless felony prosecution, based on a coordinated conspiracy and coordinated lies by a group of governmental officials, including judges,

sergeants, and deputies of a county sheriff's office constitutes an adverse action that would deter a person of ordinary firmness from exercising their First Amendment right to file lawsuits to redress grievances. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

84.    By their actions alleged herein, all taken under color of law or in conspiracy with those acting under color of law, including Defendant Rimedio, who was charged with responsibility for the County's investigation of the incident between Dr. Williams and Judge Stormer, Defendants Stormer, Rimedio, Beam, Fickes,and Wagner deprived Williams of his right to freely access courts to redress grievances that is secured to him by the First Amendment and was clearly established as of September 15, 2020. All of these actions caused damage to Williams.

85.    As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Dr. Williams' rights, Williams has suffered and will continue to suffer economic and non-economic damages for which Defendants Stormer, Rimedio, Beam, Fickes, and Wagner are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Williams is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

## Count 4
### Malicious prosecution
### Fourth Amendment and 42 U.S.C. § 1983
### (against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner)

86.    Plaintiff incorporates the previous allegations by reference.

87.    This Count 4 is alleged against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner individually, in their personal capacities.

88.    With purpose and intent, and acting under color of law or in conspiracy with those acting under color of law, including Defendant Rimedio, who was charged with responsibility for the County's investigation of the incident between Dr. Williams and Judge Stormer, Defendants engineered the baseless and malicious prosecution against Dr. Williams knowingly and without

probable cause, with the intent to deprive him of his liberty interests secured to him by the Fourth

Amendment of the U.S. Constitution. These actions include those alleged herein whereby

Defendants conspired to concoct a fabricated and falsified narrative, laden with false statements, and

dependent on Sergeant Rimedio's deliberate destruction of the footage from the four surveillance

cameras that conclusively demonstrated Williams' innocence of these malicious charges, the lack of

probable cause behind them, and Defendants' own liability to Williams for having violated his civil

rights.

89.     By their actions alleged herein, Defendants Stormer, Rimedio, Beam, Fickes, and Wagner,

taken under color of law or in conspiracy with Rimedio who was acting under color of law, they

deprived Williams of his right to be free from malicious and baseless prosecution that is secured to

him by the Fourth Amendment and was clearly established as of September 15, 2020. *King v.

Harwood*, 852 F.3d 568, 582-583 (6th Cir.2017). All of these actions caused damage to Williams,

including restraint of his liberty in being subject to the baseless criminal prosecution, and loss of

employment, including his positions serving the HOPE and Valor Courts in the Summit County

Court of Common Pleas.

90.     As a direct and proximate result of this unlawful conduct, which was intentional and showed

a spirit of ill-will, hatred, and wanton disregard for Dr. Williams' rights, Williams has suffered and

will continue to suffer economic and non-economic damages for which these Defendants are liable,

including, but not limited to, mental, emotional, and physical pain and suffering. Williams is also

entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 5**
**Fabrication/Falsification of Evidence, Due process**
**Fifth Amendment, Fourteenth Amendment and 42 U.S.C. § 1983**
**(against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner)**

91.     Plaintiff incorporates the previous allegations by reference.

92.     This Count 5 is alleged against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner individually, in their personal capacities.

93.     With purpose and intent, and acting under color of law or in conspiracy with those acting under color of law, including Defendant Rimedio, who was charged with responsibility for the County's investigation of the incident between Dr. Williams and Judge Stormer, Defendants fabricated and falsified evidence against Dr. Williams knowingly and without probable cause, with the intent to deprive him of his liberty interests secured to him by the Fourth Amendment of the U.S. Constitution. These actions include those alleged herein whereby Defendants conspired to concoct a fabricated and falsified narrative, laden with false statements, and dependent on Sergeant Rimedio's deliberate destruction of the footage from the four surveillance cameras that conclusively demonstrated Williams' innocence of these malicious charges, the lack of probable cause behind them, and Defendants' own liability to Williams for having violated his civil rights.

94.     By their actions alleged herein, Defendants Stormer, Rimedio, Beam, Fickes, and Wagner, taken under color of law or in conspiracy with Rimedio who was acting under color of law, they deprived Williams of his right to due process of law that is secured to him by the Fifth and Fourteenth Amendments and was clearly established as of September 15, 2020. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir.1997). All of these actions caused damage to Williams, including restraint to his liberty in being subject to the baseless criminal prosecution, and loss of employment, including his positions serving the HOPE and Valor Courts in the Summit County Court of Common Pleas.

95.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Dr. Williams' rights, Williams has suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable,

including, but not limited to, mental, emotional, and physical pain and suffering. Williams is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 6**
**Violation of First Amendment Right to Access Courts/Retaliatory Prosecution**
**Custom, Policy, and Practice**
**42 U.S.C. § 1983 and *Monell,* 436 U.S. 658.**
**(against Defendants Summit County and City of Akron)**

96.     Plaintiff incorporates the previous allegations by reference, and in particular the allegations set forth in Count 3 above.

97.     This Count 6 is alleged against Defendants Summit County and the City of Akron, which order, permit, tolerate, conspire to ensure, and are deliberately indifferent to the pattern and practice of First Amendment violative and retaliatory conduct set forth in Count 3 above.

98.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of trumping up baseless criminal charges against victims of police misconduct—such as for assault, resisting arrest, or disorderly conduct—to insulate themselves and their officers from liability, knowing that the average citizen will be less likely to stand a criminal trial to retain the right to pursue their civil claims., Defendants Summit County and the City of Akron deprived Mr. Williams of fundamental First Amendment protected freedoms, rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

99.     This pattern is evidenced by the egregious behavior of the Defendants in this lawsuit, particularly in falsifying statements against Williams, and destroying conclusively exculpatory video evidence in order to support and conform the evidence to those false statements.

100.    This pattern is further evidenced by the Akron Law Department's absurd actions in continuing to pursue the charges against Williams even in the face of clear evidence that conclusively exculpatory evidence was destroyed, and also in insisting that Williams sign an agreement not to sue the County, and write an apology to Judge Stormer.

101.    This pattern is also evidenced by recent instances of similar (and in some cases similarly
egregious) conduct involving Summit County and City of Akron officials, some of which are easily
identified by basic internet searches—*See, e.g., State v. Kutuchief*, Summit C.P. No. CRB1502566A;
*Kutuchief v. Armsey*, Summit C.P. No. CV-2017-03-1296 ("When Kutuchief took out a cellphone and
said he was going to take a video, Armsey took Kutuchief to the ground with a leg sweep and then
slammed him onto the car, according to Kutuchief's lawsuit. ... Kutuchief was charged with
obstructing official business and resisting arrest. ... Summit County Council approved legislation
earlier this year to settle [Kutuchief's] federal lawsuit for $118,500.")[3]; *State v. Hicks*, Akron Muni No.
21-CR-01089 ("A man whose arrest prompted outrage by city leaders and the resignation of an
Akron officer pleaded no contest Friday morning to a resisting arrest charge. ... [Body camera]
footage showed officer John Turnure putting snow in Hicks' face three times as he laid on the
ground. When Hicks caught his breath, he told officers, 'Yes, sir. I can't breathe.'[4]); *Anderson v. Kosac*,
N.D.Ohio No. 5:18 CV 1783, 2019 U.S. Dist. LEXIS 64227, at *1–2 (Apr. 15, 2019) ("[Pro se]
Plaintiff contends he was assaulted by [Summit County Sheriff's] Deputy Wright [after which] ... he
contents he was charged with kidnapping, assault, resistance, escape, and obstructing official
business."); *Cummings v. City of Akron*, 418 F.3d 676, 679 (6th Cir.2005) (*Heck* doctrine barred
excessive force claim after Akron police officers entered citizen's home without a warrant and
charged citizen with "assaulting" them; evidence nevertheless warranted denial of summary
judgment on citizen's Fourth Amendment claims for illegal entry)—and much else of which is

---

[3] Stephanie Warsmith, "Coventry trustee's life changed by wrongful arrest; Summit County approves
settlement," Akron Beacon Journal (June 19, 2018) https://www.beaconjournal.com/
story/news/local/ 2018/06/19/coventry-trustee-s-life-changed/10585821007/

[4] Stephanie Warsmith, "Akron man who had snow put in his face by an officer convicted of resisting
arrest," Akron Beacon Journal, (July 22, 2022) https://www.beaconjournal.com/story/news/2022/
07/22/akron-man-whose-arrest-sparked-outrage-convicted-resisting-arrest-charles-hicks/101101256
12002/

otherwise available in county records, subject to discovery in this suit, all of which has given the

County more than fair notice of this pattern of constitutionally violative acts which it has failed to

remedy.

102.     And this pattern is yet further evidenced by the perverse incentives to engage in such

misconduct that are created by the *Heck* doctrine itself, as recognized by federal courts that have

been exposed to their more egregious manifestations. *See, e.g., Taylor v. Cty. of Pima*, D.Ariz. No. CV-

15-00152-TUC-RM, 2017 U.S. Dist. LEXIS 228241, at *14-15 (June 6, 2017) ("The Court shares

Plaintiff's concern that *Heck* and its progeny may have unintentionally created a financial incentive

for prosecutors to require convicted defendants asserting actual innocence claims to enter no-

contest pleas in exchange for immediate release from confinement. ... If the Pima County Attorney's

Office required Plaintiff to accept a no-contest plea for the purpose of creating a *Heck* bar to § 1983

liability, the Court is concerned that such conduct undermines the fairness and integrity of the

justice system."). *See also* American Bar Association Resolution February 6, 2017,

https://www.americanbar.org/content/dam/aba/directories/policy/midyear-2017/2017-midyear-

112b.pdf ("When the prosecutor's office supports a defendant's motion to vacate a conviction based

on the office's doubts about the defendant's guilt of the crime for which the defendant was

convicted, or about the lawfulness of the defendant's conviction, the office should not condition its

support for the motion on an Alford plea, a guilty plea, or a no contest plea by the defendant to the

original or any other charge. ... Besides raising serious public policy concerns, the practice is also

unfair to the individual defendant. Guilty pleas, no contest pleas, and Alford pleas . . . complicates, if

not eliminates, their ability to file a claim seeking compensation under state and federal law."); 

Caroline H. Reinwald, "A Deal with the Devil: Reevaluating Plea Bargains Offered to the

Wrongfully Convicted," 99 N.C.L. Rev. Forum 139, 141 (2021), https://northcarolinalawreview.org

/reinwald_finalforprint-2/ (discussing perverse incentives created by *Heck* doctrine and subsequent cases demonstrating egregious manifestations of same).

103.     As a direct and proximate result of this unlawful and unconstitutional conduct, which was intentional and showed a wanton disregard for Dr. Williams' rights, Williams has suffered and will continue to suffer economic and non-economic damages for which the County and City are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Williams is also entitled to punitive damages based on this unlawful and unconstitutional conduct. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

### Count 7
### Malicious Prosecution under Ohio law
### (against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner)

104.     Plaintiff incorporates the previous allegations by reference.

105.     This Count 7 is alleged against Defendants Stormer, Rimedio, Beam, Fickes, and Wagner individually, in their personal capacities.

106.     The allegations set forth herein, if proven, establish Dr. Williams's right to recover against these Defendants on a claim for malicious prosecution under Ohio law.

107.     Probable cause did not exist to support the prosecution because the indictment relied solely upon the false statements and fabricated and falsified evidence provided by the Defendants, and the proceedings would have never been instituted in the first place were it not for Defendants' false and intentionally misleading statements.

108.     Defendants' conduct, which was intentional, retaliatory, taken in the spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, which Defendants knew had a great probability of causing, and which did cause Plaintiff to suffer substantial economic and non-economic harm, including, without limitation, mental anguish and emotional pain and suffering, attorney fees incurred in defending against the wrongful felony indictment, lost wages, and other economic losses.

**Count 8**
**Spoliation of Evidence under Ohio law**
**(against Defendants Rimedio, Beam, and Fickes)**

109.    Plaintiff incorporates the previous allegations by reference.

110.    This Count 8 is alleged against Defendants Rimedio, Beam, and Fickes, individually, in their personal capacities.

111.    The allegations set forth herein, if proven, establish Dr. Williams's right to recover against these Defendants on a claim for spoliation of evidence under Ohio law.

112.    As allegd herein, Defendants Rimedio, Beam, and Fickes knew of the pending or probable litigation involving Williams, and willfully destroyed, or willfully acquiesced to the destruction destruction of the conclusively exculpatory surveillance footage in order to negatively influence Williams' position in the case, which was in fact negatively influenced, proximately causing Williams damage, including the need to defend himself against the baseless charges and incur monetary costs and mental anguish in connection thereto, as well as lost employment opportunities suffered as a result of the continuing prosecution. *Smith v. Howard Johnson Co., Inc.* (1993), 67 Ohio St.3d 28, 29, 1993 Ohio 229, 615 N.E.2d 1037

113.    Defendants' conduct, which was intentional, retaliatory, taken in the spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, which Defendants knew had a great probability of causing, and which did cause Plaintiff to suffer substantial economic and non-economic harm, including, without limitation, mental anguish and emotional pain and suffering, attorney fees incurred in defending against the wrongful felony indictment, lost wages, and other economic losses.

**VI. Prayer for Relief**

Wherefore, Plaintiff Curtis K. Williams II, PhD, prays for judgment against Defendants in an amount in excess of $75,000.00 together with punitive damages, attorneys' fees, costs, expenses, and any other relief to which the Plaintiff may be entitled or that the Court deems equitable and just.

## VII. Jury Demand

Plaintiff demands a trial by jury on all issues within the Complaint.

Respectfully submitted,

*/s/ Peter Pattakos*

Peter Pattakos (0082884)
THE PATTAKOS LAW FIRM LLC
101 Ghent Rd., Fairlawn, OH 44333
P: 330.836.8533/F: 330.836.8536
peter@pattakoslaw.com

*Attorney for Plaintiff Curtis K. Williams II, PhD*